IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DEAN OBEIDALLAH, <br><br> Plaintiff, <br><br> v. <br><br> ANDREW B. ANGLIN, <br> DBA *Daily Stormer*, <br><br> and <br><br> MOONBASE HOLDINGS, LLC, <br> DBA Andrew Anglin, <br><br> and <br><br> JOHN DOES NUMBERS 1–10, <br> Individuals who also assisted in the <br> publication or representation of false <br> statements regarding <br> Mr. Obeidallah, <br><br> Defendants. | CASE NO. 2:17-CV-00720-EAS-EPD <br><br> Chief Judge Edmund A. Sargus <br><br> Magistrate Judge Elizabeth Preston Deavers |
| **PLAINTIFF'S MOTION FOR ADDITIONAL DISCOVERY IN AID OF DEFAULT JUDGMENT** | |

**PLAINTIFF'S MOTION FOR ADDITIONAL DISCOVERY IN AID OF DEFAULT JUDGMENT**

In accordance with the Court's October 2, 2018 Order, ECF No. 41, and as described in the concurrently filed Status Report, Plaintiff Dean Obeidallah respectfully moves the Court for limited discovery in aid of establishing a sum-certain of default judgment damages against Defendants Andrew B. Anglin and Moonbase Holdings, LLC in the above-captioned action. Attached hereto is a memorandum in support which establishes good cause for Mr. Obeidallah's request for leave to take the requested limited discovery. Also attached, as Exhibit 1, is a proposed order for the Court's consideration.

Respectfully submitted,

*/s/ Subodh Chandra (trial counsel)*

DATED: 11/16/2018

Subodh Chandra (OH Bar No. 0069233)
Donald Screen (OH Bar No. 0044070)
THE CHANDRA LAW FIRM LLC
1265 W. 6th St., Suite 400
Cleveland, OH 44113-1326
Phone: 216.578.1700 Fx: 216.578.1800
Subodh.Chandra@ChandraLaw.com
Donald.Screen@ChandraLaw.com

Johnathan Smith (D.C. Bar No. 1029373)

Juvaria Khan (N.Y. Bar No. 5027461)
MUSLIM ADVOCATES
P.O. Box 66408
Washington, D.C. 20035
Phone: 202.897.1894
johnathan@muslimadvocates.org
juvaria@muslimadvocates.org

*Admitted pro hac vice*

**TABLE OF CONTENTS**

**CONTENTS**

| Clause | Page |
|---|---|
| I.   FACTUAL BACKGROUND | 1 |
| II.  STANDARD OF REVIEW | 7 |
| III. GOOD CAUSE EXISTS FOR DISCOVERY IN AID OF DEFAULT JUDGMENT AGAINST DEFENDANTS ANDREW B. ANGLIN AND MOONBASE | 8 |
| IV.  REQUEST FOR RELIEF | 12 |

**Memorandum In Support of Plaintiff's Motion for Additional Discovery In Aid of Default Judgment**

Plaintiff Dean Obeidallah respectfully moves this Court pursuant to Rule 26(d)(1) of the Federal Rules of Civil Procedure for leave to take limited discovery in aid of establishing a sum-certain of default judgment damages against Defendants Andrew B. Anglin ("Defendant Anglin") and Moonbase Holdings, LLC ("Moonbase") (collectively, "Defendants"). The proposed requests for production are attached hereto as Exhibit 2.

This Court has previously acknowledged Mr. Obeidallah's good cause for limited third-party discovery in order to determine "(1) the need for immediate entry of default judgment against Defendant Moonbase; (2) how liability should be apportioned among the Defendants; and (3) the extent of Plaintiff's damages attributable to Defendant Moonbase." ECF No. 39, at 9. As a result of that previously authorized discovery, Mr. Obeidallah has now identified certain financial institutions and accounts used by Defendants Anglin and Moonbase to funnel contributions from the *Daily Stormer*'s readership and pay for the *Daily Stormer*'s operations. The financial details of these accounts are relevant to the second and third points discussed above, but also to the calculation of appropriate compensatory and punitive damages for Defendants' wrongful actions. Therefore, Plaintiff Dean Obeidallah respectfully seeks leave to take additional, limited, third-party discovery from these financial institutions in aid of establishing a sum-certain of default judgment damages.

Concurrently with this Memorandum, Mr. Obeidallah is submitting: (1) a Status Report regarding his efforts to file a Motion for Default Judgment, in which he seeks leave to supplement that Motion on or before Friday, February 15, 2019; and (2) a Motion for Default Judgment establishing liability for Defendants Andrew B. Anglin and Moonbase Holdings.

I.      **FACTUAL BACKGROUND**

On August 20, 2018, the Court granted Mr. Obeidallah permission to seek limited third-party discovery from Zappitelli CPAs Inc. ("Zappitelli Inc.") and Mr. Greg Anglin. Counsel for

Mr. Obeidallah then served limited document and discovery subpoenas on Zappitelli Inc. and Greg Anglin.

With regard to Zappitelli Inc., Plaintiff's counsel had numerous conversations with John and Karen Zappitelli, both of whom are officers and employees of Zappitelli Inc., following service of the document and 30(b)(6) deposition subpoenas.  In response to the document subpoena, Mr. Zappitelli produced, on behalf of Zappitelli Inc., a single document—a confirmation from the Internal Revenue Service that an Employer Identification Number had been established for Defendant Moonbase.  *See* Ex. 4-B, Moonbase EIN Ltr.  Alternatively, in lieu of the 30(b)(6) deposition, Mr. and Mrs. Zappitelli provided sworn declarations regarding the nature and extent of their association with the Defendants and Greg Anglin.  Those declarations are attached hereto as Exhibits 3 and 4.  Mr. and Mrs. Zappitelli testified that: (1) in late 2016 or early 2016, Greg Anglin requested that Zappitelli Inc. assist him with establishing Defendant Moonbase, which involved establishing an EIN and providing Greg Anglin with form paperwork from the Ohio Secretary of State, *see* Ex. 3, J. Zappitelli Decl. ¶ 4; Ex. 4, K. Zappitelli Decl. ¶ 3; and (2) in or around January 2018, conferring with Greg Anglin regarding a draft Agent Address Change for Defendant Moonbase, *see* Ex. 3, J. Zappitelli Decl. ¶ 6; Ex. 4, K. Zappitelli Decl. ¶ 3.  Other than those two instances, Mr. and Mrs. Zappitelli testified that neither they nor Zappitelli Inc. has performed any services for the Defendants.  Additionally, Mr. and Mrs. Zappitelli testified that neither they nor Zappitelli Inc. "has had, or currently has, any communication, association, or relationship with . . . [Defendant] Anglin or *The Daily Stormer*."  Ex. 3, J. Zappitelli Decl. ¶ 8; Ex. 4, K. Zappitelli Decl. ¶ 6.  As a result, Mr. and Mrs. Zappitelli were unable to provide Plaintiff with any information regarding the Defendants' financial condition or their culpability for publication of the Defamatory Article.

As for Greg Anglin, Mr. Obeidallah effected in-person service of the document and deposition subpoenas on September 25, 2018.  As explained in greater detail in the Status Report filed in

conjunction with this Motion, Greg Anglin willfully disregarded his obligations under those subpoenas for numerous weeks.  In response to the document subpoena, Greg Anglin, by and through his counsel, merely provided Mr. Obeidallah's counsel with printed copies of previously filed exhibits on October 31, 2018.  In doing so, he denied Mr. Obeidallah the opportunity to review those documents as they are kept in the ordinary course, and Mr. Obeidallah has no way of knowing whether he would have received additional probative information if Greg Anglin had complied with the subpoena.

Mr. Obeidallah's counsel also took Greg Anglin's deposition testimony on October 31, 2018 in accordance with the Court's August 20, 2018 Order.[1]  During that deposition, Mr. Anglin described how readers of the *Daily Stormer* have directed hundreds of thousands of dollars in financial contributions to "Andrew Anglin."[2]  *See, e.g.*, Ex. 5, G. Anglin Tr. 26:10-22 [hereinafter, "G. Anglin Tr.] (estimating average monthly contributions of $1,500 until 2017, "and then there as a spike in the deposits"), 27:14-28:4 (estimating total contributions from *Daily Stormer* readership of $100,000 to $125,000).  Those funds were first directed to Greg Anglin's office suite—6827 N High Street, Suite 121, Worthington, Ohio 43085 ("Suite 121").  *Id.* at 9:5-7 (Greg Anglin acknowledging Suite 121 as office space), 59:25-60:12 (contributions directed to "Andrew Anglin" and *Daily Stormer* at Suite 121).  In addition to receiving his personal mail at Suite 121, Greg Anglin authorized Defendants Anglin and

---

[1]     The recent factual background of this case prior to Greg Anglin's deposition is set forth in Section I(B) of Mr. Obeidallah's concurrently filed Status Report, as well as in his previously filed Motion for Limited Discovery in Aid of Default Judgment, ECF No. 31.  In the interest of preserving the resources of the Court, it has not been recounted here.

[2]     As previously explained, it is unclear whether "Andrew Anglin" refers to Defendant Anglin or Moonbase, as Moonbase registered "Andrew Anglin" as a trade name with the Ohio Secretary of State.  This is likely just another effort by Greg Anglin and the Defendants to conceal their activities and obfuscate any attempt to hold them liable.  In any event, Greg Anglin acknowledged having filed the "Andrew Anglin" trade name registration on Defendant Moonbase's behalf, and the *Daily Stormer* has stated that Moonbase is involved with receipt of credit card contributions from the *Daily Stormer*'s readership, *see, e.g.*, G. Anglin Tr. 67:2-68:9; Pl.'s Mot. for Limited Discovery 8, ECF No. 31 (quoting *Daily Stormer* article explaining credit card donations would appear as "Moonbase Holdings" on credit card bills).

Moonbase to direct their mail to that address.  *See, e.g.*, *id.* at 14:9-11 (Greg Anglin's personal mail), 23:9-13 (Greg Anglin authorizing Defendant Anglin "to have his personal mail directed to . . . my office"); 67:2-68:7 (Greg Anglin acknowledging he applied for "Andrew Anglin" trade name on Moonbase's behalf); A. Anglin Trade Name Reg. 3, ECF No. 23-10 (Greg Anglin designating Moonbase's "[b]usiness address" as his office, Suite 121).  In 2017, shortly after protestors announced their intention to picket outside Suite 121,[3] Greg Anglin established a PO Box—Post Office Box 208, Worthington, Ohio 43085 ("PO Box 208")—on Moonbase's behalf, to which the *Daily Stormer* redirected its readers' contributions.  G. Anglin Tr. 107:14-108:7 (Greg Anglin registered for PO Box 208), 116:3-13 (Greg Anglin acknowledging *Daily Stormer* redirected readers to send contributions to PO Box 208); PO Box 208 Reg. 2, ECF No. 23-12 (Greg Anglin registering PO Box 208 on behalf of "[b]usiness/[o]rganization" named "Andrew Anglin," which is Moonbase's trade name).

From 2013 to December 2017, Greg Anglin collected contributions that *Daily Stormer* readers directed to "Andrew Anglin" at Suite 121 and PO Box 208.  G. Anglin Tr. 26:2-9 (five years), 28:22-29:6 (last deposit in December 2017).  Once received, Greg Anglin would take one of numerous actions.  Most often, Greg Anglin would deposit the funds, approximately once a month, into an account at a bank ("Bank 1[4]") in the name of "Andrew Anglin."  *Id.* at 24:16-25:2 (deposits to account at Bank 1 in the name of "Andrew Anglin"), 25:8-11 (approximately once per month).  If the contributions were foreign currency, Greg Anglin would deposit that currency into his personal

---

[3]     Protests were announced online as early as January 5, 2017, with the protest scheduled for January 14, 2017 outside Suite 121.  *See, e.g.*, Ex. 6, Ida Vox, *Rally Against the Anglins of Daily Stormer in Ohio* (Jan. 5, 2017).  Days after the protest was announced, on January 12, 2017, Greg Anglin established PO Box 208 on behalf of Defendant Moonbase.  *See* PO Box 208 Reg., ECF No. 23-12.

[4]     Due to the controversial nature of the *Daily Stormer*, Mr. Obeidallah is not naming the financial institutions that have likely received donations from Defendants Andrew B. Anglin and Moonbase Holdings, LLC in this document.  Mr. Obeidallah is happy to provide this information to the Court at its request.

accounts at another bank ("Bank 2")[5], and then wrote a check to Defendant Anglin, which he then deposited at Bank 1. *Id.* at 31:2-14. Beginning in 2017, Greg Anglin also deposited contributions from the *Daily Stormer*'s readership in U.S. currency into his personal account at Bank 2, and then wrote checks to the account of "Andrew Anglin" at Bank 1. *Id.* at 31:15-32:13.

Greg Anglin would also use the contributions directed to "Andrew Anglin" as "reimbursement" for services that he would perform on behalf of the Defendants, including those relating to the *Daily Stormer*. *See, e.g., id.* at 49:7-51:25 (Greg Anglin "reimbursed" for paying fee to register Moonbase with Ohio Secretary of State by keeping cash from *Daily Stormer* contributions), 54:11-55:3 (Greg Anglin "reimbursed" for paying fee to register "Andrew Anglin" as trade name for Moonbase).[6] Greg Anglin would often pay fees associated with those services from his personal bank account at Bank 2 or his personal credit card before seeking such "reimbursement." *See e,g., id.* at 52:12-52:25 (check from Bank 2 to pay fee associated with filing Moonbase's Articles of Organization), 53:23-55:6 (potential check from Bank 2 to pay for Moonbase's registration of trade name "Andrew Anglin"), 80:20-81:22 (Greg Anglin's personal credit card to register domain www.dailystormer.com).

Finally, Greg Anglin used a large sum of the *Daily Stormer*'s contributions for his own benefit—having "borrowed" approximately $60,038 for a "real estate rehab"—which Greg Anglin allegedly paid back by writing a check from his personal account at another bank ("Bank 3") and depositing it into the account for "Andrew Anglin" at Bank 1. *Id.* at 120:8-121:6 (Greg Anglin "borrowed" $60,038), 123:4-23 (check from Bank 3 to Bank 1).

---

[5] Mr. Greg Anglin's checking account at Bank 2 has since been closed for unknown reasons, and he later began banking at Bank 3. *Id.* at 53:1-9.

[6] Greg Anglin testified that there was no conversation or agreement reflecting this arrangement with Defendants Anglin or Moonbase. Instead, Greg Anglin claimed this was just an "implicit understanding" regarding how he would perform services for the Defendants. G. Anglin Tr. 51:8-16.

Greg Anglin testified that he does not "keep any accounting or ledger of the amounts" that are sent to "Andrew Anglin" by the *Daily Stormer*'s readers, *id.* at 52:2-4, nor did he produce any materials to Mr. Obeidallah in response to the document subpoena in this regard. Also, though testifying that he does not "really use email much" and that "[i]t's not really my thing," Greg Anglin stated that it is his practice to delete emails from both his inbox and sent folders. *Id.* at 12:23-13:3 (email usage), 69:11-14 (deletions).

In addition to contributions from the *Daily Stormer*'s readers, Greg Anglin testified that he received "legal documents" directed to Defendants Anglin and Moonbase at Suite 121 and PO Box 208. This is unsurprising since Greg Anglin filed paperwork with the Ohio Secretary of State representing that Defendant Anglin was Moonbase's registered agent for service, and service could be affected at Suite 121 or, later, at PO Box 208. *See, e.g.*, Moonbase's Agent Address Change 4, ECF No. 31-27 (designating Moonbase's "[n]ew [a]ddress of [a]gent" as PO Box 208). Despite his role in designating Suite 121 and PO Box 208 as appropriate addresses for legal process on Defendant Moonbase, Greg Anglin testified that he throws all such communications in the trash. G. Anglin Tr. 58:17-23. Alternatively, he places all legal documents directed to Defendants Anglin "in a big plastic tub," where they sit, and he makes no effort to forward them to anyone. *Id.* at 58:5-16.

In addition to the *Daily Stormer* contributions, Greg Anglin testified that he maintains two envelopes for Defendant Anglin—one with foreign currency, and one with United States currency—in a security box in Greg Anglin's name at Bank 3. *Id.* at 121:21-122:15. Greg Anglin was uncertain how much of Defendant Anglin's money remains in those envelopes, but he estimated $2,000. *Id.* at 122:11-15.

Greg Anglin testified that he was not aware of any bank accounts that Defendant Moonbase uses, whether it has any financial obligations, whether it owns any property, or whether it still exists as a business entity. G. Anglin Tr. 20:2-15, 61:4-9. He also does not know whether Moonbase files

tax returns. *Id.* at 57:19-21. He has allegedly never known the financial condition of Moonbase, and does not know whether it is on the cusp of insolvency. *Id.* at 106:25-107:13. He also testified that, as far as he is aware, Moonbase does not maintain any financial records. *Id.* at 32:14-19. Similarly, he testified that he does not know why readers of the *Daily Stormer* were sending the contributions that he deposited, nor does he allegedly know what Defendants Anglin or Moonbase do with that money. *Id.* at 147:7-149:5.

## II.     STANDARD OF REVIEW

Courts enjoy "broad discretion" to order discovery. *Arista Records, LLC v. Does 1-15*, No. 2:07-cv-450, 2007 WL 5254326, at *3 (S.D. Ohio Nov. 5, 2007). While the Federal Rules of Civil Procedure anticipate that discovery will typically not begin "before the parties have conferred as required as required by Rule 26(f)," they allow for discovery prior to the Rule 26(f) conference "by court order." Fed. R. Civ. P. 26(d); *see also Arista Records*, 2007 WL 5254326, at *2. This provision requires that the party requesting expedited discovery show "good cause," which "may be found where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party." *Arista Records*, 2007 WL 5254326, at *2 (internal quotations and citations omitted). Courts have regularly found good cause to authorize such discovery when, *inter alia*, a defendant defaults and the plaintiff needs discovery in order to establish liability and/or damages in pursuit of default judgment. *See, e.g.*, *Twitch Interactive, Inc. v. Johnston*, No. 5:16-cv-03404-BLF, 2017 WL 1133520, at *4 (N.D. Cal. Mar. 27, 2017) (authorizing discovery in aid of forthcoming motion for default judgment from payment processors, financial institutions, and co-defendant); *Antoine v. Boutte*, No. 3:15-cv-00561-JWD-EWD, 2016 WL 6138252, at *4 (M.D. La. Oct. 20, 2016) (same from third-party distributors regarding quantum of damages); *Adobe Sys. Inc. v. Bunhey*, No. 5:13-cv-01365-VAP-OPX, 2013 WL 12140304, at *2 (C.D. Cal. Oct. 29, 2013) (same from third-party distributors regarding defaulting defendant's purchase, sale, and/or distribution of counterfeit products); *Texas*

*Guaranteed Student Loan Corp. v. Dhindsa*, No. 1:10-cv-00335-LJO-SKO, 2010 WL 2353520, at \*3 (E.D. Cal. June 9, 2010) (same from defaulting defendant regarding quantum of damages); *Sheridan v. Oak Street Mortg., LLC*, 244 F.R.D. 520, 522 (E.D. Wis. 2007) (same regarding class certification and quantum of damages).

### III.  GOOD CAUSE EXISTS FOR DISCOVERY IN AID OF DEFAULT JUDGMENT AGAINST DEFENDANTS ANDREW B. ANGLIN AND MOONBASE

The Court should grant Mr. Obeidallah leave to take limited discovery in aid of establishing a sum-certain of default judgment damages, because doing so is necessary for the purposes of quantifying the amount of compensatory and punitive damages attributable to Defendants Anglin and Moonbase.

In both his Complaint and his concurrently filed Motion for Default Judgment, Mr. Obeidallah seeks punitive damages for the false and defamatory actions and statements made by Defendants Anglin and Moonbase.  *See, e.g.*, Compl. ¶ 74, ECF No. 1; *id.* at 37 (prayer for relief).  As the Supreme Court of Ohio has noted, the purposes of punitive damages are "(1) to punish the wrongdoer, and (2) to deter others from similar conduct."  *Wagner v. McDaniels*, 459 N.E.2d 561, 564 (Ohio 1984). Whether a damages award succeeds in punishing a wrongdoer or deterring others depends on the scale of the damages award relative to the net worth of the defendant, and in particular, to the amount of profit that that wrongful action generated for the wrongdoer.  *See id.* (stating "evidence of a defendant's net worth may be considered by the fact-finder in determining appropriate punitive damages").

In this case, Defendants Anglin and Moonbase likely received hundreds of thousands of dollars in "contributions" from readers of the *Daily Stormer* who were encouraged by their wrongful actions.  G. Anglin Tr. at 27:22-28:4.  These donations "spike[d]" upward in 2017, when the defamatory article that harmed Mr. Obeidallah was posted.  *Id.* at 26:14-22.  And Defendant Anglin has specifically used his wrongful actions against Mr. Obeidallah as the basis to request additional

contributions from the *Daily Stormer* readers, posting: "Presumably, even if Dean [Obeidallah] disappears, the Association of Moslems will still sue me. **So send me some money**, lmao."[7] *See* Ex. 8, Daily Stormer, *Steven Crowder Allegedly Hunting Manchester Bombing Mastermind Dean Obeidallah in Isis-Occupied Syria* (Aug. 29, 2017) (emphasis added). The twin goals of punishment and deterrence will not be achieved if Defendants Anglin and Moonbase are permitted to profit from their extreme and tortious conduct, and a fulsome accounting of their profits is necessary to avoid such an outcome. Therefore, the requested discovery from Banks 1, 2, and 3 regarding the amount of money received by Defendants Anglin and Moonbase, and the timing of those payments, are relevant to Mr. Obeidallah's crafting of a reasonable and appropriate damages request in this case.

In addition to punitive damages, information about the Defendants' financial conditions is relevant to the preliminary calculation of damages for many of Mr. Obeidallah's claims. *See, e.g.*, *State, ex rel. Brown v. Dayton Malleable, Inc.*, 438 N.E.2d 120, 128 (Ohio 1982) (stating, in *dicta*, that "evidence of the wealth of the defendant is admissible . . . in cases where wealth is necessarily involved in determining damages, such as in actions for defamation or injury to reputation"); *Sayavich v. Creatore*, 2009-Ohio-5270, ¶ 80, 2009 WL 3165555, at *8 (Oh. App. Ct. Sep. 29, 2009) (assessing defamation claim and "conclude[ing] that evidence of a defendant's net worth is only relevant as to punitive damages"); *Gosden v. Louis*, 687 N.E.2d 481, 499 (Oh. App. Ct. 1996) ("Information about defendants' financial status is admissible in defamation cases to help the jury determine proper awards of compensatory and punitive damages. Without this information, a jury is less able to determine the likely influence a defendant may have had in the community. More importantly, a jury cannot determine what would constitute an effective punitive damage award unless they have an understanding of the defendant's financial status.").

---

[7]     The acronym "lmao" is a crass slang abbreviation that indicates laughter. Oxford Living Dictionaries, *LMAO*, https://en.oxforddictionaries.com/definition/lmao (November 16, 2018).

With respect Mr. Obeidallah's claim for common-law misappropriation of name and likeness, Courts have specifically noted that "the monetary benefit that [defendant] received as a result of a wrongful use of [plaintiff]'s name is an appropriate (although not exclusive) measure of damages." *See James v. Bob Ross Buick, Inc.*, 855 N.E.2d 119, 124 (Ohio Ct. App. 2006). In similar actions for invasion of privacy of public figures, expert witnesses opining on appropriate damages have cited the financial conditions of the defendants, including the "value" of a defendant's website. *See* Ex. 7, Hulk Hogan Sex Tape Earned Gawker Up to $15M, Jury Told, Law360, https://www.law360.com/articles/770586/hulk-hogan-sex-tape-earned-gawker-up-to-15m-jury-told (last visited November 15, 2018); Ex. 9, Hulk Hogan Awarded $115 Million in Privacy Suit Against Gawker, New York Times, https://www.nytimes.com/2016/03/19/business/media/gawker-hulk-hogan-verdict.html (last visited November 15, 2018) (Noting that punitive damages calculation "raises the prospect that [defendant] will have to submit to a detailed examination of its finances in court so the jury can assess the scale of the damages"). Mr. Obeidallah has engaged an expert witness to provide similar analysis here, but cannot do so without the limited, additional discovery sought.

Mr. Obeidallah was hopeful that information regarding the financial status of Defendants Anglin and Moonbase, which is relevant to demonstrating the compensatory and punitive damages to which he is entitled, could obtained through the subpoenas directed to Greg Anglin and Zappitelli Inc. However, Greg Anglin did not produce any documents other than those already filed by Mr. Obeidallah in this case (in fact, he merely provided Mr. Obeidallah's counsel with print outs of previously filed exhibits), and neither Greg Anglin nor Zappitelli Inc. was able to provide information regarding the financial condition of the Defendants. Greg Anglin also professed ignorance as to the finances of Defendants Anglin and Moonbase, and confirmed that, although he funneled contributions from the *Daily Stormer*'s readership on behalf of Defendants Anglin and/or Moonbase for five years, he did not keep any logs or records regarding the amounts involved in those

transactions. *See, e.g.,* G. Anglin Tr. 32:14-19, 51:2-4, 57:19-21, 61:4-9, 106:25-107:13, 147:7-149:5. Alternatively, Zappitelli Inc. confirmed that it did not perform financial services for Defendants, and as a result did not have records relating to their financial conditions. Ex. 3, J. Zappitelli Decl. ¶¶ 4, 6-7. Therefore, this information can only be obtained from the financial institutions that Greg Anglin used to funnel contributions from *Daily Stormer*'s readership.

Specifically, in order to answer the outstanding questions regarding Defendants' financial condition, which are necessary in support of his Motion for Default Judgment, Mr. Obeidallah respectfully seeks leave to issue narrowly-tailored subpoenas duces tecum to the financial institutions identified above in Part I as Banks 1, 2, and 3. The proposed requests for production, the substance of which would be incorporated in those subpoenas, are attached hereto as Exhibit 2. As explained above, good cause exists for such discovery because Greg Anglin used accounts at Banks 1, 2, and 3 to funnel contributions from the *Daily Stormer*'s readership on behalf of Defendants Anglin and Moonbase, and because he professed uncertainty regarding the volume of those transactions. *See, e.g.,* G. Anglin Tr. 24:16-25:5, 32:8-13, 113:2-17. This information cannot be obtained from any other sources because: (1) Defendants Anglin and Moonbase are in default, and thus unlikely to respond to discovery requests[8]; and (2) Greg Anglin, who processed donations on behalf of both Defendants, testified that he was not aware of any other source of financial records that would reflect this information.

---

[8] As previously explained, Defendants Anglin has regularly acknowledged and mocked the pendency of this federal action. *See, e.g.,* Mem. In Supp. of Pl.'s Mot. for Limited Discovery 6, ECF No. 31. This was again confirmed through Greg Anglin's testimony. According to Greg Anglin, he received a call from Defendant Anglin (from a U.S. number) days before he was deposed, and during that call Defendant Anglin made statements suggesting he was already aware of the subpoena's scope. G. Anglin Tr. 35:5-10, 36:10-22.

## IV.     REQUEST FOR RELIEF

For these reasons, Mr. Obeidallah respectfully moves this Court pursuant to Rule 26(d)(1) of

the Federal Rules of Civil Procedure for leave to take limited discovery in aid of establishing a sum-

certain of default judgment damages. The requests for production, which Mr. Obeidallah proposes

directing to Banks 1, 2, and 3, are attached as Exhibit 2.


Respectfully submitted,



DATED: 11/16/2018                                    /s/ *Subodh Chandra (trial counsel)*

Subodh Chandra (OH Bar No. 0069233)
Donald Screen (OH Bar No. 0044070)        *Attorneys for Plaintiff Dean Obeidallah*
THE CHANDRA LAW FIRM LLC
1265 W. 6th St., Suite 400
Cleveland, OH 44113-1326
Phone: 216.578.1700 Fx: 216.578.1800
Subodh.Chandra@ChandraLaw.com
Donald.Screen@ChandraLaw.com

Johnathan Smith (D.C. Bar No. 1029373)
Juvaria Khan (N.Y. Bar No. 5027461)
MUSLIM ADVOCATES
P.O. Box 66408
Washington, D.C. 20035
Phone: 202.897.1894
johnathan@muslimadvocates.org
juvaria@muslimadvocates.org
*Admitted pro hac vice*