IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DEAN OBEIDALLAH,<br><br>    Plaintiff,<br><br>        v.<br><br>ANDREW B. ANGLIN,<br>    DBA *Daily Stormer*,<br><br>and<br><br>MOONBASE HOLDINGS, LLC,<br>    DBA Andrew Anglin,<br><br>and<br><br>JOHN DOES NUMBERS 1–10,<br>    Individuals who also assisted in the<br>    publication or representation of false<br>    statements regarding<br>    Mr. Obeidallah,<br><br>    Defendants. | CASE NO. 2:17-CV-00720-EAS-EPD<br><br>Chief Judge Edmund A. Sargus<br><br>Magistrate Judge Elizabeth Preston Deavers |

**SUPPLEMENT TO PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANTS ANDREW B. ANGLIN AND MOONBASE HOLDINGS, LLC**

**SUPPLEMENT TO PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT AGAINST
DEFENDANTS ANDREW B. ANGLIN AND MOONBASE HOLDINGS, LLC**

Plaintiff Dean Obeidallah respectfully submits this supplement to his previously filed Motion for Default Judgment against Defendants Andrew B. Anglin and Moonbase Holdings, LLC.  ECF No. 44.  This supplement supports Mr. Obeidallah's request for default damages. A memorandum follows.

Also attached in support of the Motion is a declaration authenticating Exhibits A–M, and attesting that the Defendants are neither minors nor incompetent persons, nor currently serving in the military.  The Defendants have not appeared in this action and are not entitled to notice of this application for default judgment.

**SUPPLEMENTAL MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANTS ANDREW B. ANGLIN AND MOONBASE HOLDINGS, LLC**

## I.  INTRODUCTION

On November 16, 2018, Plaintiff Dean Obeidallah moved the court under Rule 55(b)(2) of the Federal Rules of Civil Procedure for default judgment against Defendants Andrew B. Anglin ("Defendant Anglin") and Moonbase Holdings, LLC ("Moonbase") (collectively, the "Defendants") in the above-captioned action ("Action").  ECF No. 44.  That Motion establishes that Counts I, II, III, and V of the Complaint are well-pleaded and meritorious.

Mr. Obeidallah also sought leave to supplement his Motion for Default Judgment on or before Friday, February 15, 2019 to seek appropriate damages and limited additional discovery.  The Court granted the request for discovery.  The limited discovery conducted reveals Defendants received hundreds of thousands of dollars in cash and check donations from readers of the *Daily Stormer*, and that many of those readers specifically reference lawsuits against Defendants as the reason for their donation.  *See* Sealed Exhibit A[1] (exemplary donations to Defendant Anglin referencing lawsuits). Discovery also reveals Defendants received upwards of $16,000 per month from readers of their defamatory postings—orders of magnitude more than indicated by prior discovery.  *See* Sealed Exhibit B at 16 ($16,641 in donations the month of the Defamatory Article).  Defendants have also received nearly $400,000 in additional donations from *Daily Stormer* readers.  *See* Exhibit C at 3 (estimating $378,680.44 in Bitcoin received by Defendant Anglin).

Mr. Obeidallah seeks compensatory damages for each of his four claims for the emotional distress and reputational harm that he has suffered as a result of being falsely labelled as a terrorist.

As part of those compensatory damages, and as supported by law, he also seeks disgorgement of the hundreds of thousands of dollars in illegal gains that Defendants reaped from their improper

---

[1] Sealed Exhibits A and B refer to exhibits attached to the contemporaneously filed Motion to Seal.

conduct at Mr. Obeidallah's expense. Defendants used their defamation of Mr. Obeidallah, and the existence of this lawsuit, as a specific basis to solicit additional revenue in the form of donations from readers of the *Daily Stormer*.

Mr. Obeidallah also seeks punitive damages for each of his four claims, both to punish Defendants for their wrongful actions and to deter Defendants and others from similar actions in the future. A significant punitive-damage award is justified based on Defendants' repeated, malicious pattern of intentionally publishing falsehoods designed to cause emotional distress through postings on the *Daily Stormer*, both before and after their defamatory publication of the June 1, 2017 article that led to this action (the "Article"). In addition, Defendants' refusal to participate in this proceeding, while mocking its existence, justifies an award of significant punitive damages.

Mr. Obeidallah's recovery on these state-law claims is guided by, among other things, §§ 2315.18 and 2315.21 of the Ohio Revised Code. *See, e.g., Mengelkamp v. Lake Metro. Hous. Auth.*, 549 F. App'x 323, 334 (6th Cir. 2013) (discussing Ohio cap for compensatory award in federal case). Those sections provide that in "a civil action for damages for injury or loss to person or property," Ohio Rev. Code § 2315.18(A)(7), there is no limitation on the amount of compensatory damages recoverable for economic loss, *id.* § 2315.18(B)(1), but "the amount of compensatory damages that represents damages for noneconomic loss . . . shall not exceed the greater of two hundred fifty thousand dollars or an amount that is equal to three times the economic loss," *id.* § 2315.18(B)(2); *see also Wayt v. DHSC, L.L.C.*, 2018 WL 6521443, at *3 (Ohio Dec. 8, 2018).

Based on the foregoing, Mr. Obeidallah seeks $250,000 in compensatory damages from Defendants jointly and severally, as well $500,000 in punitive damages from each of Defendant Anglin and Defendant Moonbase, for a total award of $1,250,000, plus fee-shifting recovery of lodestar attorneys' fees and costs as part of the punitive-damages award, to be determined by the Court. Although the facts of this case justify at least that amount for each of Mr. Obeidallah's four

claims, Mr. Obeidallah seeks only a single recovery totaling that amount across all four claims. As explained in the subsections set forth below, such an award is well supported by the Complaint's allegations and available evidence.

## II.    STANDARD OF REVIEW

In ruling on a motion for default judgment, the well-pleaded allegations of Mr. Obeidallah's complaint (ECF No. 1) are accepted as true. *Board of Trustees of Ohio Laborers' Fringe Benefits Programs v. Dan Ray Constr.*, No. 2:17-CV-00180, 2018 WL 2436184, at *1 (S.D. Ohio May 30, 2018) (citing *Antointe v. Atlas Turner, Inc.*, 66 F.3d 105, 110 (6th Cir. 1996)). The amount of damages must be proven to a reasonable degree of certainty by a preponderance of the evidence. *See Bell v. Zurich Am. Ins. Co.*, 156 F. Supp. 3d 884, 889 (N.D. Ohio 2015); see also *Anderson v. Wade*, 33 F. App'x 750, 756 (6th Cir. 2002) (holding that plaintiff at default judgment "was required to show compensatory damages with 'reasonable certainty' by a preponderance of the evidence").

Although a court may conduct an evidentiary hearing to determine damages, it need not do so where, as here, damages "can be ascertained on the record before the court." *See Joe Hand Promotions, Inc. v. RPM Management Co. LLC*, No. 2:11-CVv-00377, 2011 WL 5389425, at *1 (S.D. Ohio Nov. 7, 2011). The Court in its discretion may rely on the record, affidavits, or any other supporting evidence to determine appropriate default damages. *See PNC Equipment Finance, LLC v. Zapantis*, No. 1:12-cv-201, 2015 WL 3795890, at *1 (S.D. Ohio June 18, 2015) (record evidence sufficient to show damages); *Boards of Trustees of Ohio Laborers' Fringe Benefit Programs v. Waugh Excavating, LLC*, 2016 WL 2892483, at *2 (S.D. Ohio May 18, 2016) (entering default judgment for damages and attorney fees, and holding that the Complaint and record evidence were "sufficient to allow a decision on the record without an evidentiary hearing").

## III.    COMPENSATORY DAMAGES

Mr. Obeidallah seeks compensatory damages in the amount of $250,000 from Defendants for the emotional and reputational harms that he suffered due to their malicious acts, as well as to disgorge the unlawful profits that they reaped from those acts.  The circumstances set forth below justify compensatory damages exceeding $250,000 on each of the four claims in this action.  But mindful of § 2315.18, Mr. Obeidallah requests a collective total of $250,000 in compensatory damages.

### A.  Libel (Count I)

Defendants are barred from challenging the well-pleaded factual averments in Mr. Obeidallah's pleading.   ECF No. 44, at 2.  Defendants made more than 30 defamatory statements falsely claiming that Mr. Obeidallah:

> (1) planned to and perpetrated terrorist acts;
>
> (2) threatened to assault his radio show audience;
>
> (3) is a wanted fugitive;
>
> (4) is affiliated with and supports ISIS;
>
> (5) has praised known terrorists;
>
> (6) has advocated for an Islamic takeover of the United States; and
>
> (7) disparaged or attacked Caucasians.

ECF No. 44 at 4–7.  Each of those statements was and is false, which Defendants knew at the time of making the statements.  *Id.*; ECF No. 1 ("Obeidallah Compl.") ¶¶ 23, 24, 29, 32, 34, 36, 38, 40, 42–44.  Because these statements "import an indictable criminal offense involving moral turpitude," and "tend to injure one in his trade or business occupation," each of them constitutes libel *per se*. *Dunnigan v. City of Lorain*, No. 02-CA-008010, 2002 WL 31313216, at *6 (Ohio Ct. App. Oct. 16, 2012); *see also* ECF No. 44, at 8 (analyzing remaining elements of libel claim).

4

Where, as here, a plaintiff has adequately pleaded and established defamation *per se*, "plaintiff need not show actual damages because they are presumed." *Groce v. New York Times Company*, 345 F.Supp. 3d 961, 974 (S.D. Ohio 2018). In such cases, "the plaintiff need not allege or prove any special damages. . . . [G]eneral damages are presumed and nominal damages are available in any event." *Hadi v. State Farm Ins. Cos.*, No. 2:07-CV-00060, 2008 WL 4877766, at *11 (S.D. Ohio Nov. 12, 2008). Mr. Obeidallah is entitled to presumed compensatory damages due to the emotional and reputational harm that he suffered, as well as nominal damages. *See Lucarell v. Nationwide Mut. Ins. Co.*, 44 N.E.3d 319, 344 (Ohio Ct. App. 2015) (reversed on other grounds, 152 Ohio St.3d 453 (Ohio 2018))) (awarding plaintiff nominal damages in addition to $100,000 in emotional-distress damages).

While the amount of damages suffered due to emotional and reputational harm is necessarily a fact-specific inquiry, the uncontested facts of this case show that Mr. Obeidallah suffered extreme emotional harm as a result of the painful and infuriating experience of being publicly and falsely accused of terrorism. Exhibit D, Declaration of Dean Obeidallah ("Obeidallah Decl.") ¶ 3. Mr. Obeidallah's anguish was multiplied by the fact that the Article contradicts his extensive efforts to fight against racist and anti-Muslim hatred toward Muslims and Arab Americans, and by the fact that his close family members were also affected. *Id.* ¶¶ 4, 14. As a result of the Defamatory Article, and the history of violence by *Daily Stormer* readers, Mr. Obeidallah also rightfully feared for his personal safety in the aftermath of the article. *Id.* ¶¶ 5–7. That fear significantly disrupted Mr. Obeidallah's life both personally and professionally, causing him to be suspicious and nervous when merely walking outside, and preventing him from engaging with his fans. *Id.* ¶¶ 5–14.

Courts considering claims of defamation *per se* on facts similar to Mr. Obeidallah's have routinely awarded damages well in excess of the $250,000 that Mr. Obeidallah requests. For instance, in *Eramo v. Rolling Stone, LLC*, the plaintiff was defamed by "the publication of a false and later discredited article" similar to the intentionally false statements in the article published by Defendants

which defamed Mr. Obeidallah. *Compare Eramo v. Rolling Stone, LLC*, No. 3:15-cv-00023, 2015 WL 12752469 (W.D. Va. May 12, 2015) ("Eramo Compl.") ¶¶ 1–5, *with* Obeidallah Compl. ¶¶ 1–5. The defendants in *Eramo* made "clearly false" statements under the guise of news or journalism, but "violated commonly accepted journalistic norms and consciously failed to investigate sources and information that they believed would have revealed the falsity of the charges they leveled." Eramo Compl. ¶¶ 7–10. Similarly, Defendants in this case purport to operate a news website, but "conducted no independent investigation," "ignored the[] widespread news reports" that showed their claims to be false, and "possessed no information to support their false statements of fact." Obeidallah Compl. ¶¶ 2, 25–27. Defendants in both cases presented intentionally doctored evidence to supposedly support their false claims. *See* Eramo Compl. ¶ 10; Obeidallah Compl. ¶¶ 27–42.

Mr. Obeidallah also suffered harms similar to those suffered by the *Eramo* plaintiff, including reputational and emotional harm. Obeidallah Decl. ¶¶ 3, 4, 8, 9; *Compare* Obeidallah Compl. ¶ 61 ("Mr. Obeidallah has suffered, and will continue to suffer, reputational harm as a result of Defendant's unlawful and tortious actions."); *with* Eramo Compl. ¶ 8 ("these claims had a devastating effect on Dean Eramo's reputation …. [she] saw herself tarred in the national press as the chief architect of a conspiracy"). These reputational harms are particularly acute due to Mr. Obeidallah's unique career. *Compare* Obeidallah Decl. ¶ 15 ("As a comedian and political commentator, my career relies heavily on popular opinion and the goodwill of the public."), *with Eramo v. Rolling Stone Magazin et al.*, 33 Nat. J.V.R.A. 8:C6, 1000 WL 286128 (Verdict and Settlement Summary) (Ms. Eramo's "reputation suffered greatly, [and] … the trust that is necessary for her to function as a counselor no longer exists"). Mr. Obeidallah suffered emotional harm as a result of violent threats he received. Obeidallah Decl. ¶¶ 5–13; *Compare* Obeidallah Compl. ¶¶ 46–42 (listing threats to shoot, hang, and otherwise commit violence against Mr. Obeidallah made by readers of defamatory article), *with* Eramo Compl. ¶ 203 (listing harmful and violent threats made by readers of defamatory article).

6

For her extensive reputational and emotional distress, Ms. Eramo was awarded a total of $3,000,000 in compensatory damages from the author and publisher of the article. *See Eramo v. Rolling Stone, LLC*, No. 3:15-CV-00023, 2016 WL 6779109 (W.D. Va. Nov. 7, 2016) (Verdict, Agreement, and Settlement). The similar facts in this case justify a compensatory damages award of at least $250,000 from Defendants Anglin and Moonbase.

Mr. Obeidallah's request is further supported by the unique emotional and reputational harms Muslim Americans or Americans of Middle Eastern descent suffer from being a falsely labelled a "terrorist." In *Pensacola Motor Sales, Inc. v. Daphne Automotive, LLC*, an American citizen of Iranian descent was defamed by a rival car dealer who referred to his business as the "Taliban Toyota" and falsely informed potential customers that the plaintiff was a terrorist. *See* 155 So.3d 930, 933–34 (Ala. 2013). Like Mr. Obeidallah, the plaintiff suffered damages including "the loss or impairment of reputation and/or standing in the community and mental anguish or suffering." *Id.* at 943; *see* Obeidallah Decl. ¶ 3 ("it anguished me to think that anyone reading the Article might associate me, even for a minute, with the awful thoughts of Andrew Anglin"); ¶ 15 (The fact that the Article makes it appear as if I support and carry out terrorism also hurts my reputation") Such defamatory statements not only cause victims to fear for their safety, but also result in the particular horror of "being accused of both funding terrorism and of being an enemy of the country he loves and is proud to call 'home,'" which magnifies emotional distress. *Pensacola Motor Sales*, 155 So.3d at 943. This principle applies with equal force to Mr. Obeidallah, whose status as a Muslim American is central to both his personal reputation and his livelihood. Obeidallah Decl. ¶ 4 ("The emotional harm and anguish that I suffered as a result of the Article was especially damaging because it undermined the dedication that I have shown to improving the image of Muslims and Arab-Americans in American culture"); Obeidallah Compl. ¶¶ 4, 11, 62, 66.

The plaintiff in *Pensacola Motor Sales* was awarded more than $2,500,000 in compensatory damages and $5,000,000 in punitive damages. *Id.* at 944. On appeal, the Alabama Supreme Court upheld the award, noting that plaintiff was entitled to presumed damages due to the commission of slander *per se*, and the award was "sufficiently grounded" in the victim's mental anguish. *Id.* at 943. The similar facts in Mr. Obeidallah's case justify a compensatory-damages award of at least $250,000 from Defendants. *See also Yammine v. DeVita*, 43 A.D.3d 520, 523 (N.Y. App. Div. 2007) (upholding $200,000 compensatory damages award for false and defamatory claim that plaintiffs were "terrorists").

For the reasons stated above, Mr. Obeidallah is entitled to compensatory damages of at least $250,000 for the emotional and reputational harms he suffered due to Defendants' acts of libel.

## B. False light invasion of privacy (Count II)

Defendants committed a tort for false light invasion of privacy by publicizing their false claims that Mr. Obeidallah planned and perpetrated terrorist acts, among other crimes. ECF No. 44, at 13–15. These statements included fabricated messages purporting to be from Mr. Obeidallah, in which Defendants made it appear as if Mr. Obeidallah was confessing to and celebrating his role as the mastermind of the Manchester Bombing. *Id.*; Obeidallah Compl. ¶¶ 27–44. Those false statements were serious enough to provoke high offense to any reasonable person. ECF No. 44, at 14–15; Obeidallah Compl. ¶ 77. Defendants made those statements knowing they were false, and with reckless disregard to their falsity. ECF No. 44, at 14–15; Obeidallah Compl. ¶ 81.

Mr. Obeidallah has recited in detail the harms that he suffered as a result of Defendants' false-light actions. Defendants' false statements encouraged readers of the *Daily Stormer* to confront Mr. Obeidallah, and directly led to violent threats made against him. Obeidallah Compl. ¶ 81; Obeidallah Decl ¶¶ 5–6. As a result of Defendants' false statements, readers of the *Daily Stormer* threatened to attack Mr. Obeidallah with armed drones and with guns, and to kill him by hanging and other means.

Obeidallah Complaint ¶¶ 46–52; Obeidallah Decl ¶ 7. As a result of these threats, and of the publication of Defendants' false statements, Mr. Obeidallah's reputation in the community was damaged, he suffered emotional distress, and he reasonably feared for his security. Obeidallah Compl. ¶¶ 4, 8, 56, 57, 58; Obeidallah Decl. ¶¶ 4–16. Mr. Obeidallah's reputation suffered particularly enhanced harm because Defendants' false statements make it appear as if Mr. Obeidallah used his appearances on CNN and on national radio, through which he makes his livelihood as a comedian and political commentator, to promote terrorism. Obeidallah Compl. ¶ 62; Obeidallah Decl. ¶¶ 4, 15–16.

The harms Mr. Obeidallah suffered because of Defendants' false-light invasion of privacy are intertwined and co-extensive with his harms suffered as a result of Defendants' acts of libel. *See Welling v. Weinfeld*, 866 N.E.2d 1051, 1059 (Ohio 2007) (acknowledging overlap with defamation, but holding that false light invasion of privacy is a separately cognizable tort made necessary, in part, by "the accessibility of the Internet" and "lowered . . . ethical standards"). Therefore, Mr. Obeidallah incorporates by reference the analysis of his damages due to defamation in Section III(A), which applies equally to his damages for false-light invasion of privacy. *See Borg v. Cloutier*, 2018 WL 3117171, at *15–16 (Conn. Super. Ct. May 8, 2018) (upholding identical damages awards for false light and defamation based on same offensive and defamatory statements publicized on webpage operated by defendant).

For the reasons stated above, Mr. Obeidallah is entitled to compensatory damages of at least $250,000 for the emotional and reputational harms he suffered due to Defendants' acts of false-light invasion of privacy.

### C.  Intentional infliction of emotional distress (Count III)

Defendants have committed a tort for intentional infliction of emotional distress under Ohio law by publishing false statements claiming that Mr. Obeidallah planned to and did perpetrate terrorist acts, among other crimes.  ECF No. 44, at 15–18.  These actions were intended to cause, or were made with, at a minimum, reckless disregard for the fact that they would cause Mr. Obeidallah severe and serious emotional distress.  ECF No. 44, at 15–18; Obeidallah Compl. ¶¶ 1, 84.  Because of these actions, Mr. Obeidallah did in fact suffer emotional distress, including fear for his life, as a result of the violent threats encouraged by Defendants' actions.  *See* Obeidallah Compl. ¶¶ 84, 87, 88, 90, 94; Obeidallah Decl. ¶¶ 4–14.

Although the amount of damages suffered due to intentional infliction of emotional distress can be difficult to calculate, courts considering facts similar to Mr. Obeidallah's have awarded damages of nearly $250,000 on this claim alone.  For instance, in *Bikkina v. Mahadevan*, a Ph.D. student brought a claim for intentional infliction of emotional distress on the grounds that his dissertation advisor had wrongly accused the student of falsifying scientific papers.  *See* 241 Cal.App.4th 70, 76 (Cal. Ct. App. 2015).  Like Mr. Obeidallah, the Ph.D. student suffered "severe and enduring" distress, including "fear[] that he would lose his job."  *Id.* at 88; Obeidallah Compl. ¶¶ 8, 9, 60, 66–68, 87.  Both Mr. Obeidallah and the Ph.D. student also rightfully feared for their physical safety as a result of their respective defendants' actions.  *Bikkina*, 241 Cal.App.4th at 88; Obeidallah Decl. ¶¶ 5–14.  Based on his suffered harm, including "physical pain/mental suffering, loss of enjoyment of life, humiliation, embarrassment, inconvenience, and emotional distress," the plaintiff in *Bikkina* was awarded $215,000 in non-economic damages for intentional infliction of emotional distress.  *See Bikkina v. Mahadevan*, No. RG14-717654, 2018 WL 1795581, at *3 (Cal. Super. Feb. 9, 2018) (Verdict, Agreement, and Settlement).  The similar facts in this case justify a compensatory damages award of at least $250,000

from Defendants. *See also Armstrong v. Shirvell*, 596 Fed. Appx. 433, 455 (6th Cir. 2015) (affirming award of $1,750,000 in compensatory damages for intentional infliction of emotional distress).

### D. Common law misappropriation of Mr. Obeidallah's name and likeness (Count V)

Defendants have committed a tort for common-law misappropriation of name and likeness by using Mr. Obeidallah's name, image, and Twitter account to promote their own website and to solicit advertisements and donations. *See* ECF No. 44 at 18–19; Obeidallah Compl. ¶¶ 4, 96–98, 99, 100–01. Based on Defendants' acts of common-law misappropriation of name and likeness, and the harms suffered by Mr. Obeidallah as a result of them, Mr. Obeidallah is entitled to compensatory damages for both (1) Defendants' unjustly derived profits from their misappropriation, and (2) Mr. Obeidallah's reputational and emotional harm as a result of this misappropriation.

Ohio law provides that when a defendant has derived profits from "unauthorized use of an individual's persona," a plaintiff is entitled to "actual damages, including any profits" so derived. Ohio Rev. Code Ann. § 2741.07. Defendants' profits represent "an appropriate (although not exclusive) measure of [Mr. Obeidallah]'s actual damages" for common-law privacy torts, including misappropriation of name and likeness. *See James v. Bob Russ Buick, Inc.*, 855 N.E.2d 119, 122 n.2, 124 (Ohio Ct. App. 2006). Here, an exact determination of Defendants' profits was systematically stymied by Defendants' default and refusal to participate not only in discovery but in this litigation. Defendants have publicly acknowledged the existence of this litigation but have actively avoided any participation in it. *See* ECF No. 17 at 10; ECF No. 17-3 (Defendant Anglin boasting "I am being sued by" Mr. Obeidallah). As a result, reliance on the probable proof of damages based on the best evidence available to Mr. Obeidallah is proper. *See, e.g., Eastman Kodak Co. v. Southern Photo Co.*, 273 U.S. 359 (1927) (explaining that reliance on probable and inferential proof of damages is appropriate in circumstances where defendant actively frustrates a more precise computation); *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251 (1946) (same: "Any other rule would enable the wrongdoer to profit by his

11

wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain. Failure to apply it would mean that the more grievous the wrong done, the less likelihood there would be recovery").

With the benefit of existing and forthcoming third-party discovery, however, the record reflects that Defendants received profits significantly exceeding $198,000. The fact that Defendant Anglin posted on the *Daily Stormer* specifically using Mr. Obeidallah's name and the mention of this lawsuit to demand that his readers "send me some money" indicates that Defendants' misuse of Mr. Obeidallah's name led directly to a significant portion of the donations received by Defendants. ECF No. 47 at 11, n.2.

Greg Anglin, the father of Defendant Anglin and a person who has filed corporate paperwork on behalf of Defendant Moonbase, deposited checks and cash received as donations from *Daily Stormer* readers into an account in the name of Defendant Anglin. ECF No. 46-6 ("Greg Anglin Tr.") at 26:10-12; 67:2-68:9. Between February 2016 and October 2018, Defendant Anglin's account at one financial institution alone received more than $198,000 in donations and deposited into Defendant Anglin's account. *See* Sealed Ex. B at 1–52. In 2017, the year in which Defendants published the false statements misappropriating Mr. Obeidallah's name, image, and Twitter account, those donations "spike[d]" upwards, resulting in over $16,000 in donations the month of the Defamatory Article. Greg Anglin Tr. at 26:10-12; Sealed Ex. B at 16.

The $198,000 in deposits handled by Greg Anglin represent only a portion of the total profits generated by Defendants and the *Daily Stormer*, as the *Daily Stormer* also received donations via credit card and Bitcoin. *See* ECF No. 31, at 8; Greg Anglin Tr. 34:15–35:4; 67:2–68:9. One third party that tracks monetary bitcoin donations to "suspected neonazi[s]" estimates Defendant Anglin has received over $378,000 in Bitcoin, in addition to the funds in Defendant Anglin's bank account. *See* Exhibit C

12

at 3. Defendant Anglin has also publicly boasted of large donations to the *Daily Stormer* that are not reflected in the records of the financial institution, suggesting that he maintains additional accounts to store profits received from his unlawful postings on the *Daily Stormer*. *See* Ex D, White House Slams Fake News Hoaxsters as Journalist Squeal Like the Pigs They Are, June 27, 2017, at 3 (noting that donors to the *Daily Stormer* had pledged over $22,000 per month); Ex. E, Andrew Anglin Hatreon (noting recurring donations of $3,655 per month); Ex. F, Andrew Anglin has Retained America's #1 First Amendment Lawyer to Represent Him Against SPLC (noting that Defendant "reached the $150,000 goal" in donations, which are not reflected in the financial-institution records).

Defendant Anglin has further profited from advertising on the *Daily Stormer*, including on the pages containing the misuses of Mr. Obeidallah's name. *See* Obeidallah Compl. ¶ 100. Statements by Defendant Anglin indicate that the advertising revenue received was significant. Just three weeks after Defendants posted the Article that gave rise to this action, Defendant Anglin stated that while his website did not always have advertisements, when it did, it would have generated at least "$6000 a month," even "from the worst possible ads at the lowest conceivable rates." Ex D, at 3 (also noting that Defendants' advertisements made $600 in "65 hours").

Given Defendants' refusal to participate in this lawsuit, it is not possible to determine the exact amount of profits earned by Defendants as a result of their misuse of Mr. Obeidallah's name and likeness. In light of the above facts, however, Defendants' unjustly derived profits amount to at least $198,000, and that amount should be disgorged, and factored into the $250,000 compensatory damages award that Mr. Obeidallah now requests.

In addition to disgorgement of Defendants' unlawful profits, Mr. Obeidallah is entitled to compensatory damages for the emotional and reputational harm he suffered as a result of Defendants' misappropriation of his name and likeness. Defendants' misuse of Mr. Obeidallah's name arises from the same false and defamatory statements, including intentionally modified pictures and images, which

13

give rise to his claims for libel, false light invasion of privacy, and intentional infliction of emotional distress. ECF No. 44 at 18–19. The harms and damages recited in Sections III(A), (B), and (C) of this supplement, above, apply equally to Mr. Obeidallah's claim for misappropriation of name and likeness. As explained in those sections, which are incorporated by reference, the harm caused to Mr. Obeidallah by these statements exceeds $250,000.

## IV. PUNITIVE DAMAGES

In addition to compensatory damages, Mr. Obeidallah seeks punitive damages of $500,000 from each of Defendants Anglin and Moonbase. The circumstances set forth below justify punitive damages exceeding $500,000 on each of the four claims in this action. But because the acts that this Court should seek to punish and deter by awarding punitive damages have collectively led to those four claims, Mr. Obeidallah seeks a collective total of $500,000 per Defendant, jointly and severally.

### A. Defendants have acted with actual malice

Punitive damages may be awarded in tort cases where actual malice exists, as shown by either "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty*, 512 N.E.2d 1174, 1176 (Ohio 1987). As explained with respect to the "actual malice" element of Mr. Obeidallah's claim for libel, Defendants acted with malice and reckless disregard for the rights and safety of Mr. Obeidallah by falsely accusing him of perpetrating the Manchester Bombing, having conducted no independent investigation regarding that claim and ignoring readily available public information that would have shown Defendants statements to be false. *See* ECF No. 44, at 12–13; Obeidallah Compl. ¶¶ 24, 26, 71. Defendants also acted with "hatred, ill will, or a spirit of revenge," as shown by their intentional manipulation of Plaintiff's Twitter messages to convince their readers that Mr. Obeidallah committed heinous acts, and by their invitation for their readers to "confront" Mr. Obeidallah, which led to

14

violent threats.  *See Spadafore v. Blue Shield*, 486 N.E.2d 1201, 1205 (Ohio Ct. App. 1985) ("intentional

alteration of documents … is the type of intentional and deceptive behavior more indicative of actual

malice"); ECF No. 44, at 12–13; Obeidallah Compl. ¶¶ 6–8, 10, 27, 46–51.

      **B.**    **Deterrence and punishment justify an award of $500,000**

      The Supreme Court of Ohio has observed the difficulties of precisely quantifying punitive

damages:

> Determining the amount of damages which is the maximum for adequate
> compensation is not an easy task. No simple mathematical formula can be applied as
> to either a minimum or a maximum, and there is a wide range between those figures.
> The decision rests as much on policy considerations as it does anything else and some
> degree of arbitrariness cannot be totally divorced from the decision . . . .

*Moskovitz v. Mt. Sinai Md. Ctr.*, 635 N.E.2d 331, 344 (Ohio 1994) (finding $1,000,000 in punitive

damages appropriate).  Mr. Obeidallah respectfully submits that the three unique "policy

considerations" of this case justify a punitive-damages award of $500,000 against each Defendant.  In

particular, Defendants have (1) indicated flagrant disregard for this proceeding; (2) repeatedly

committed similar offenses; and (3) directly profited off of such offenses.  In light of the twin purposes

of punitive damages "(1) to punish the wrongdoer, and (2) to deter others from similar conduct,"

these three facts show that a significant award is necessary to achieve punishment and deterrence in

this case. *Wagner v. McDaniels*, 459 N.E.3d 561, 563 (Ohio 1984).

      **First**, the amount necessary to punish Defendants and deter others is particularly high due to

Defendants' contempt for this proceeding.  Defendants have flouted the Court and the law at every

stage of this litigation, while acknowledging and mocking Mr. Obeidallah's claims. *See* ECF No. 47 at

11, n.2 (noting Defendant Anglin's reference to this litigation as a fundraising tool).  They have failed

to appear in this case, stymying Mr. Obeidallah's attempts to obtain discovery relevant to his damages.

And they have intentionally concealed monetary assets to prevent any recovery by Mr. Obeidallah.  *See*

Exhibit H, SPLC Is Suing Anglin! Donate Now, April 27, 2017 (requesting Bitcoin donations "because

it can't be seized easily by court orders."). Because punitive damages are "more about a defendant's behavior than the plaintiff's loss," Defendants' disregard for the negative consequences of their actions justify a large award. *See, e.g., Wightman v. Consol. Rail Corp.*, 715 N.E.2d 546, 553 (Ohio 1999) (upholding punitive damages award of $15,000,000 because Defendant "was unwilling to accept responsibility" for his actions).

**Second**, Defendants' extensive history of the behavior at issue in this lawsuit makes punitive damages in the amount of at least $500,000 necessary. In determining what amount of punitive damages would be an effective deterrent, the Court must consider "prior or similar acts by the defendant." *See Wightman v. Consol. Rail Corp.*, 640 N.E.2d 1160, 1172 (Ohio Ct. App. 1994) (holding that Court abused its discretion by failing to award punitive damages). The list of such acts is extensive. Defendants have published numerous additional articles, both before and after the Article at issue in this action, making similar false and defamatory claims about Mr. Obeidallah. *See* Exhibit I, Isis Operative Dean Obeidallah Says Moslems The Real Victims, Nov. 16, 2015 (falsely claiming that Mr. Obeidallah is an "ISIS operative"); Exhibit J, Steven Crowder Allegedly Hunting Manchester Bombing Mastermind Dean Obeidallah in ISIS-Occupied Syria, August 29, 2017 (repeating false claims that Mr. Obeidallah is a "terrorist" who "mastermind[ed] the Manchester bombing"). The need for punishment and deterrence is great.

Additionally, Defendant Anglin is a serial offender. He is currently named in three lawsuits that raise claims similar to those raised by Mr. Obeidallah. *See Gersh v. Anglin*, 9:17-cv-00050-DLC-JCL (D. Mont.), Exhibit K ("Gersh Complaint") ¶¶ 208–32 (claims of invasion of privacy, intentional inflection of emotional distress, malice, and violation of the Montana Anti-Intimidation Act); *Dumpson v. Ade*, 1:18-cv-01011-RMD (D.D.C.), Exhibit L ("Dumpson Compl.") ¶¶ 128–88 (intentional inflection of emotional distress and stalking, among other claims); *Sines v. Kessler*, 3:17-cv-00072-NKM-JCH (W.D. Va.), Exhibit M ("Sines Compl.") ¶¶ 336–70 (violation of Plaintiff's rights under 42 U.S.C.

§ 1985(3) by violence and intimidation).  Defendant Moonbase is also named in the *Gersh* and *Sines* litigations.  Each of those cases, like this case, is based at least in part on Defendants' use of the *Daily Stormer* website to defame, harass, and harm individuals.  *See* Gersh Compl. ¶ 4 ("Mr. Anglin turned his horde of anti-Semitic fanatics loose on Ms. Gersh in a series of *Daily Stormer* articles"); Dumpson Compl. ¶ 2 ("As he had done in other high-profile hate crimes against Jews and Muslims, Defendant Anglin targeted Ms. Dumpson using racist language . . . [and] included her name and photo in his article" on the *Daily Stormer*); Sines Compl. ¶¶ 25–26 ("Anglin uses the Daily Stormer to entice his followers to harass and intimidate 'Jew/feminist/etc' individuals . . . .").  This repeated behavior shows that litigation alone, without the award of significant punitive damages, will not discourage Defendants from inflicting further harm on others.

**Third**, significant punitive damages are justified because the harmful and unlawful actions that form the basis of this case, as well as the *Gersh*, *Dumpson*, and *Sines* cases, are not merely incidental to the operation of the *Daily Stormer*.  Rather, they are the core of its business model.  Defendant Anglin consistently used and continues to use defamatory statements, and statements referencing the lawsuits filed by injured persons such as Mr. Obeidallah, as a significant fundraising mechanism for the *Daily Stormer*.  *See, e.g.*, Exhibit F (using the threat of alleged "lawsuits from Jewish legal activists" to request that users "donate now and help sustain The Daily Stormer and let it continue propagandizing on its uniquely massive scale.").  And Defendant Anglin has specifically referenced his false and defamatory statements against Mr. Obeidallah, and this lawsuit, as a reason for his readers to "send me some money."  Exhibit J, at 7 ("Presumably, even if Dean disappears, the Association of Moslems will still sue me. So send me some money, lmao.").

Defendants have not only injured Mr. Obeidallah (and other similarly situated individuals), they have weaponized their unjust actions to boast about and profit from them, which further raises the level of award necessary to deter future action.  *See Angus v. Ventura*, No. 2740-M, 1999 WL 33287,

17

at *4 (Ohio Ct. App. Jan. 27, 1999) (fact that defendant "bragged about" actions supported punitive damages award). As a result, Defendants have raised significantly more money by reference to their lawsuits than through standard donations. For instance, while Defendant Anglin's father testified that donations to the *Daily Stormer* averaged "maybe $1,500 a month on average up until mid 2017," (Greg Anglin Tr. at 26:18–20), Defendants claim to have raised more than 100 times that amount by soliciting donations directly in response to the lawsuits filed against them. *See* Exhibit H, at 2 (requesting "a six figure sum" of donations with the goal that "Gersh should be made to lose her home" in litigation); Exhibit G, at 4 (noting that Defendants raised "the $150,000 goal" for legal donations in six weeks); Sealed Exhibit A (showing thousands of dollars in donations for Defendant Anglin's lawsuits).

### C. Mr. Obeidallah's request is consistent with similar awards

Mr. Obeidallah's request for $500,000 in punitive damages, in addition to being necessary to punish Defendants' and deter similar actions for the three reasons discussed above, is well in line with the punitive damages awarded by this and other courts.

Applying Ohio law, Courts have upheld punitive damages awards of significantly more than the $500,000 sought by Mr. Obeidallah. *See Wightman*, 715 N.E.2d at 552–53 ($15,000,000); *Dick*, 2008 WL 4444765, at *5 ($3,000,000). The Sixth Circuit, on similar facts, has found that a punitive-damages award of $500,000 for defamation is "not excessive in relation to awards in similar cases." *See Armstrong v. Shirvell*, 596 Fed. Appx. 433, 458 (6th Cir. 2015) (upholding $500,000 punitive-damages award for defamation due to "highly reprehensible . . . ongoing pattern of intentional misconduct" resulting in "distress and intimidation"); *see also Glennon v. Dean Witter Reynolds, Inc.*, 83 F.3d 132, 139 (6th Cir. 1996) (upholding $750,000 in punitive damages for defamation claim).

Mr. Obeidallah's request is also aligned with the statutory-damages cap of § 2315.21, which limits the amount of punitive damages that may be recovered in a tort action. Ohio Rev. Code Ann.

§ 2315.21(D)(2). A plaintiff's recovery is limited to twice the amount of compensatory damages from each defendant. § 2315.21(D)(2)(a); *T.P. v. Weiss*, 990 N.E.2d 1098, 1104 (Ohio Ct. App. 2013). Mr. Obeidallah's request for $500,000 per defendant does not exceed two times his request of $250,000 in compensatory damages.

Recovery may be further limited by an individual's net worth. § 2315.21(D)(2)(b). But Defendants bear the burden to demonstrate their net worth, and a potential award should not be reduced on this basis where, as here, Defendants have not met that burden. *See Swartz v. Di Carlo*, No. 1:12CV3112, 2019 WL 168324, at *2 (N.D. Ohio Jan. 11, 2019); *Moore v. Schill*, No.CV-12-785088, at *3 (Ohio Ct. App. Jan. 31, 2019) (holding that trial court abused its discretion by reducing punitive-damages award based on defendant's alleged net worth).[2]

For the reasons stated above, a punitive-damages award of at least $500,000 from each of Defendants Anglin and Moonbase is necessary to punish Defendants for their wrongful acts of libel, false-light invasion of privacy, intentional infliction of emotional distress, and common-law misappropriation of name and likeness—and to deter Defendants and others from their serial habit of performing similar acts in the future.

Mr. Obeidallah further requests that in connection with the punitive-damages award, the Court award lodestar attorneys' fees and costs in an amount to be determined via judgment once the initial judgment amount is established.

---

[2] Due to their default here, Defendants have also waived any argument to limit an award of punitive damages on the basis of their net worth. *See Dick v. Tab Tool & Die Co., Inc.*, No. 2008-CA-0013, 2008 WL 4444765, at *5 (Ohio Ct. App. Oct. 2, 2008) (upholding award of $3,000,000 in punitive damages, as defaulted defendant "failed to produce the financial information" that could have otherwise mitigated award).

## V.     CONCLUSION

For the foregoing reasons, and as stated in his Motion for Default Judgment (ECF No. 44), Mr. Obeidallah respectfully requests that the Court find Defendants Anglin and Moonbase jointly and severally liable for (1) libel (Count I); (2) false-light invasion of privacy (Count II); (3) intentional infliction of emotional distress (Counts III); and (4) common-law misappropriation of Mr. Obeidallah's name and likeness (Count V), and award Mr. Obeidallah $250,000 in compensatory damages, and $500,000 in punitive damages from each of Defendant Anglin and Defendant Moonbase, plus attorneys' fees and costs via fee-shifting in a lodestar amount to be determined by the Court.

A proposed order will be submitted.

February 22, 2019

Abid R. Qureshi (D.C. Bar No. 459227)
Tyler S. Williams (D.C. Bar No. 888242297)
LATHAM & WATKINS LLP
555 Eleventh St., NW, Suite 1000
Washington, D.C. 20004-1304
Phone: 202.637.2200 Fx: 202.637.2201
abid.qureshi@lw.com
tyler.williams@lw.com

Sirine Shebaya (D.C. Bar No. 1019748)
Juvaria Khan (N.Y. Bar No. 5027461)
MUSLIM ADVOCATES
P.O. Box 66408
Washington, D.C. 20035
Phone: 202.897.1894 Fx: 202.508.1007
sirine@muslimadvocates.org
juvaria@muslimadvocates.org

*Admitted pro hac vice*

Respectfully submitted,

*/s/ Subodh Chandra (trial counsel)*
Subodh Chandra (OH Bar No. 0069233)
Donald Screen (OH Bar No. 0044070)
THE CHANDRA LAW FIRM LLC
1265 W. 6th St., Suite 400
Cleveland, OH 44113-1326
Phone: 216.578.1700 Fx: 216.578.1800
Subodh.Chandra@ChandraLaw.com
Donald.Screen@ChandraLaw.com

*Attorneys for Plaintiff Dean Obeidallah*